**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

TIMOTHY COOPER,                                        :

                        Case No. 3:07-cv-300

          Plaintiff,

                        District Judge Walter Herbert Rice
                        Chief Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.                   :

**REPORT AND RECOMMENDATIONS**

       Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

       Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict

(now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984);  *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits, a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Social Security Act.  42 U.S.C. §1381a.  With respect to the present case, eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C.

2

§1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff protectively filed applications for SSD and SSI in May, 2003, alleging disability from November 14, 2002, due to a back impairment. (Tr. 61-63; 457-63; 89-98).[1] Plaintiff's applications were denied initially and on reconsideration. (Tr. 40-44; 46-48; 465-69; 471-73). A hearing was held before Administrative Law Judge Thomas McNichols on March 6, 2006, (Tr. 482-535), who determined that Plaintiff is not disabled. (Tr. 19-31). The Appeals Council denied Plaintiff's request for review, (Tr. 6-9), and Judge McNichols' decision became the Commissioner's final decision.

In determining that Plaintiff was not disabled, Judge McNichols found that Plaintiff has severe chronic low back pain with radiation into the legs attributed to a vertebrogenic disorder of the lumbosacral spine and a post-laminectomy syndrome, diabetes with a suggestion of early polyneuropathy, and depression, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 25, ¶3 ; Tr. 27, ¶ 4). Judge McNichols also found that Plaintiff has the residual functional capacity to perform a limited range of sedentary work. (Tr. 27, ¶ 5). Judge McNichols then used section 201.21 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 30 ¶10). Judge McNichols concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 31, ¶ 11).

Although Plaintiff has a history of various medical conditions including a heart-related impairment, see Tr. 247-51, a lung impairment, see Tr. 297, and a mental impairment, see Tr. 252-58, his primary complaints relate to a back impairment and he challenges the

---

[1] Plaintiff previously filed an application for SSD in 1994, and his request for hearing was dismissed when he abandoned his claim. See Tr. 21.

Commissioner's findings only as to that impairment. (Doc. 7). Accordingly, the Court will review the medical evidence related to Plaintiff's alleged back impairment.

In 1982 Plaintiff underwent a laminectomy, but was able to return to work post-surgery for several years. See Tr. 413; 82-86. In November, 2002, Plaintiff sustained a work-related injury to his low back and right knee. See, *e.g.,* Tr. 156. Although Plaintiff's knee impairment resolved, he continued to have back pain which was treated conservatively without relief. See, *e.g.,* Tr. 167-68; 347; 349.

Plaintiff underwent a right hemilaminectomy at L3-4 and L4-5 with excision of recurrent disc herniation in February, 2003, which Dr. Cole performed. (Tr. 176; Tr. 301-49). Post-operatively, Plaintiff developed a spinal fluid fistula and on March 16, 2003, he underwent a repair of the fistula. (Tr. 199). Subsequently, Plaintiff developed a wound infection and on April 3, 2003, he underwent a surgical debridement of that wound infection. (Tr. 330). Plaintiff then participated in occupational therapy during the period May 12 through May 26, 2003. (Tr. 212-17).

Plaintiff received treatment from Dr. Abbott during the period May 12 through June 9, 2003. (Tr. 218-40). On June 6, 2003, Dr. Abbott reported that Plaintiff was able to stand/walk for less than 10 minutes in an 8-hour day and for less than 10 minutes without interruption, sit for 4 hours in an 8-hour day and for 2 hours without interruption, and that he was not able to lift/carry any weight. *Id.* Dr. Abbott also reported that Plaintiff was unemployable and that she expected Plaintiff's limitations to last 12 or more months. *Id.*

On June 4, 2003, Dr. Cole noted that Plaintiff had persistent back pain, tenderness to palpation in the posterior lumbar spine and that his lumbar spine nerve root provocation testing was positive. (Tr. 320). A June 25, 2003, EMG revealed moderate neurogenic EMG changes in the

right quadriceps muscles, findings consistent with right femoral nerve entrapment at or above the inguinal ligament, mild peripheral neuropathy with mild diffuse neurogenic EMG changes in the lower extremity muscles, and nerve conduction velocities which were somewhat reduced. (Tr. 314-15).

During the period September 23 to November 3, 2003, Plaintiff attended 5 "land visits" and 3 "pool visits" in a physical therapy program. (Tr. 260-70). Plaintiff's radicular symptoms did not improve during that period of time and Plaintiff stopped attending therapy. *Id.*

Plaintiff continued to receive post-operative treatment from Dr. Cole during the period November 8, 2003, through May 19, 2004. (Tr. 393-400). During that period of time, Dr. Cole essentially noted that Plaintiff had a reduced range of motion, a narrow-based gait, and a negative neurological examination. *Id.* Dr. Cole also noted that generally, Plaintiff's spine problem was somewhat better than it was at the onset. *Id.*

Plaintiff received treatment from Dr. Goodson for diabetes, hypertension, back pain, depression, and insomnia during the period January 21, 2003, through September 29, 2004. (Tr. 360-88). On September 27, 2004, Dr. Goodson reported that Plaintiff had right leg atrophy and low back pain with history of four surgeries. *Id.* Dr. Goodson also reported that Plaintiff was able to stand/walk for 30 minutes in an 8-hour day and for 10 minutes without interruption, sit for 3 hours in an 8-hour day and for 1 hour without interruption, was unemployable, and that his limitations would last 12 or more months. *Id.*

An EMG performed on April 22, 2004, was abnormal and revealed acute right L4 and L5 radiculopathy of advanced severity, left L5 and S1 nerve root injury of a more chronic and milder nature, and no convincing evidence of lumbar plexopathy or primary muscle disease. (Tr.

390).  The EMG was interpreted as suggesting an early or mild sensorimotor polyneuropathy which might be attributable to Plaintiff's diabetes.  *Id.*

An MRI of Plaintiff's lumbar spine performed on April 23, 2004, revealed multiple lumbar surgeries, a 4-mm generalized disc bulge at L1-2 causing ventral thecal sac impression causing mild bilateral neural stenosis, marked desiccation of the disc at L2-3 with a 4-mm generalized disc bulge, ligamentous and facet hypertrophy causing moderate left neural foraminal stenosis and mild right neural foraminal stenosis, and moderate central stenosis, a complete desiccation of the disc with endplate degenerative changes at L3-4 with ligamentous and facet hypertrophy, generalized disc bulge with ligamentous and facet hypertrophy causing mild left neural foraminal stenosis, moderate right neural foraminal stenosis and mile central stenosis, widening of the right neural foramina at L4-5 with moderate bilateral neural foraminal stenosis due to bony osteophytes, osteophytes predominantly on the right left neural foramina at L4-5, scoliosis with bony changes that extend from L1 through L5, and post-op changes on the right at L5-S1.  (Tr. 391-92).

On January 11, 2005, treating physician Dr. Boehmer reported that she had been treating Plaintiff since October, 2004, (see Tr. 402-12), with treatment primarily focused on hypertension, diabetes, and elevated cholesterol, that she had spoken with him at times about his chronic pain in his legs and back, that those had been relieved with Ibuprofen and Neurontin, and that he did complain of difficulty sitting or standing for long periods of time as well as some numbness in both legs.  (Tr. 389).  Dr. Boehmer also reported that Plaintiff had difficulty with memory and concentration.  *Id.*  During the period March 14 through July 20, 2005, Plaintiff continued to receive treatment from Dr. Boehmer for diabetes, hypertension, and COPD, as well as for his complaints of memory problems and sleep problems.  (Tr. 427-33).

7

Examining physician Dr. Vitols noted on September 15, 2005, that Plaintiff had a history of low back pain which started in approximately 1980, had a laminectomy in 1982, a hemilaminectomy and discectomy in 2003, and a wound infection following the 2003 surgery which "went to his brain". (Tr. 412-26). Dr. Vitols also noted that Plaintiff reported having had five spinal surgeries in the past but that this history could not be confirmed by records. *Id.* Dr. Vitols reported that Plaintiff's reflexes were symmetrical and normal in intensity, he had no muscle wasting, no gait alteration, and that his Babinski's was negative. *Id.* Dr. Vitols also reported that Plaintiff had an antalgic gait, moderate myospasm to palpation in the dorsolumbar spine, tenderness to palpation throughout the lumbosacral junction, restricted ranges of motion of the lumbosacral spine in all planes, positive straight leg raising bilaterally at 70 degrees, and that he was able to perform heel-to-toe walking with some difficulty. *Id.* Dr. Vitols reported further that Plaintiff's reflexes were +1 bilaterally, his calf and thigh measurements were symmetrical, there was no decreased sensation in either lower extremity, and that he had painfully restricted motion within his lumbar spine. *Id.* Dr. Vitols' impression was post-laminectomy syndrome with previous post-operative infection, impaired memory as per Plaintiff, diabetes per history, hypertension per history, exogenous obesity, and depression per history. *Id.* Dr. Vitols opined that Plaintiff's work capabilities and tasks of daily living were affected by his limitations, he was able to lift/carry up to 5 pounds frequently and up to 10 pounds occasionally, stand/walk for 4 hours in an 8-hour day and for ½ hour without interruption, and that his ability to sit was not affected by his impairment. *Id.*

A November 18, 2005, MRI of Plaintiff's lumbar spine revealed levoscoliosis of the lumbar spine, diffuse degenerative disk space narrowing, no definite evidence of severe spinal stenosis, and postsurgical changes of the lower lumbar spine. (Tr. 444).

Dr. Boehmer continued to treat Plaintiff for diabetes, hypercholesterolemia, hypertension, back pain, and COPD during the period August 9 through December 1, 2005. (Tr. 445-54). During that time, Plaintiff also complained of forgetfulness, fatigue, and an upper respiratory infection. *Id.*

The medical advisor (MA) testified at the administrative hearing that Plaintiff did not have the appropriate loss of neurological function to satisfy Listing 1.04, there was no evidence of nerve damage, that he had neuropathy and that was probably from his diabetes and probably the cause of the leg pain, there was no doubt Plaintiff had chronic back pain for the past two years, and that the presence of scar tissue would cause the pain Plaintiff reported. (Tr. 515-24).

Plaintiff alleges in his Statement of Errors that the Commissioner erred when he failed to find Plaintiff disabled when: (1) the Commissioner limited Plaintiff to sedentary work with a prohibition against stooping and Social Security has determined that a complete inability to stoop combined with a limitation to sedentary work results in a significant erosion of the sedentary occupational base; (2) one of the two exemplar jobs which the VE identified exceeded the residual functional capacity the Commissioner determined Plaintiff has; and (3) the Commissioner failed to properly evaluate his complaints of pain. (Doc. 7).

In support of his first Error, Plaintiff relies on Social Security Ruling ("SSR") 96-9p for the proposition that most unskilled sedentary jobs require the ability to stoop at least occasionally and that the complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply.

Although SSR 96-9p indeed provides that a complete inability to stoop would significantly erode the unskilled sedentary occupational base, as Plaintiff noted, the ruling also

9

provides that consultation with a VE may be particularly useful for cases, such as Plaintiff's, where the individual is limited to less than occasional stooping. SSR 96-9p, 1996 WL 374185. In other words, the Ruling provides that consideration should still be given to whether there is other work in the national economy that the individual is capable of performing considering age, education, and work experience. *Id.* That is exactly what the Commissioner did when he obtained the testimony from a VE. Stated differently, the Commissioner properly relied on the VE's testimony in determining that there is a significant number of jobs in the economy that Plaintiff is capable of performing in spite of his inability to stoop. See, *infra*. Therefore, the Commissioner did not err in that regard.

Plaintiff argues in support of his second Error that the VE's testimony was inconsistent with the Dictionary of Occupational Titles (4th ed. 1991),1991 WL 679717 (G.P.O.) (DOT), because the job of addresser has a reasoning level of two in the DOT and such a reasoning level requirement is inconsistent with his ability to perform jobs that involve only one and two-step instructions.

Judge McNichols found that Plaintiff is limited to jobs that involve, *inter alia,* low stress with no production quotas, simple one or two-step tasks requiring little, if any, concentration, and no complex or detailed instructions. (Tr. 27, ¶ 5). In his hypothetical question to the VE, Judge McNichols included, *inter alia*, a restriction to low stress jobs defined as jobs that involve no production quotas, and a restriction to simple one or two-step tasks which would require little, if any, concentration. (Tr. 527). In response to Judge McNichols' hypothetical question, the VE testified that there are 1,900 sedentary jobs in the economy that an individual with the described restrictions could perform, and that jobs of addresser and lens inserter were examples of those jobs

10

Tr. 528.  In addition, the VE indicated that, with the exception of his testimony with respect to a need to alternate sitting and standing, his testimony regarding the functional limitations of the jobs he identified are compatible with how such jobs are classified by the DOT.  (Tr. 529).  The VE explained that with respect to sit/stand exception, he could, "say based on my own experience that the jobs that I gave ... do accommodate that restriction." *Id.*

The DOT identifies addresser as a clerical-type job that involves addressing such things as envelopes, cards, and advertising literature.  DOT 209.587-010.  The DOT provides that the job of addresser requires a reasoning Level of 2 which involves applying common sense understanding to carry out detailed but uninvolved written or oral instructions and dealing with problems involving a few concrete variables in or from standardized situations. *Id.*  Simply stated, Plaintiff's position is that because he is limited to simple one and two-step tasks, he is not able to perform the job of addresser because it requires a reasoning Level of 2.

Several courts have found that Level 2 reasoning is consistent with the ability to perform simple, routine work. *See, e.g., Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005)(finding Level 2 reasoning to be more consistent with limitation to simple, routine work tasks); *Meissl v. Barnhart,* 403 F.Supp.2d 981, 983-85 (C.D. Ca. 2005)(finding limitation to simple and repetitive tasks to be closer to Level 2 reasoning); *Flaherty v. Halter,* 182 F.Supp.2d 824, 850-51(D.Minn. 2001)(finding Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks).  It is true that at that least one court, *Lucy v. Chater,* 113 F.3d 905, 909 (8th Cir. 1997), has disagreed with the position taken by the above referenced courts. There is no controlling precedent in the Sixth Circuit. However, this Court is persuaded by the analysis of the *Meissl* court:

This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for Meissl's other work as a stuffer given the ALJ's RFC finding limiting Meissl to "simple, repetitive" tasks. This Court finds that it does not.

As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." DOT at 1011. In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables ...." DOT at 1011. The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that Meissl could perform, namely a stuffer.

A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables ...." DOT at 1011. Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

...

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii);; *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach

12

is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938. Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005)(holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart,* 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir. 2004)("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine,

13

> repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.
>
> *Flaherty v. Halter,* 182 F.Supp.2d 824, 850 (D.Minn. 2001).

*Meissl,* 403 F.Supp.2d at 983-84.

This Court concludes that Plaintiff's limitation to low stress work with no production quotas, simple one or two-step tasks requiring little, if any, concentration, and no complex or detailed instructions is not inconsistent with the ability to perform jobs with a reasoning Level of 2. Therefore, in finding that there is a significant number of jobs in the economy that Plaintiff is capable of performing, the Commissioner did not err by relying on the VE's testimony.

Plaintiff argues in support of his third Error that the Commissioner failed to properly analyze his subjective complaints and allegations of disabling pain.

There is a two-step process for evaluating pain. First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain. *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986). Second, the intensity and persistence of the alleged pain are evaluated by considering all of the relevant evidence. *See, Jones,* 945 F.2d at 1366-70.

The measure of an individual's pain cannot be easily reduced to a matter of neat calculations. *Jones, supra*. There are no x-rays that can be taken that would objectively show the

14

precise level of agony that an individual is experiencing. *Id.* Hence, in evaluating the intensity and persistence of pain, both physicians and laymen alike, must often engage in guesswork. *Id.* The Commissioner's own guidelines acknowledge the most inexact nature of this evaluation:

> Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.

*Jones,* 945 F.2d at 1369-70, *quoting* S.S.R. 88-13.

The Commissioner may not disregard a claimant's subjective complaints of pain solely because they are not supported by the objective medical evidence. *See,* 20 C.F.R. §404.1529(c)(2). Other factors which the Commissioner must consider include the location, duration, frequency, and intensity of the pain, what precipitates or aggravates the pain, the treatments or other methods the claimant uses to alleviate the pain, the type, dosage, effectiveness, and side effects of any medication the claimant takes to relieve the pain; and how the pain affects the claimant's daily life. *See,* 20 C.F.R. §404.1529(c)(2)-(3); *see also, Jones,* 945 F.2d at 1369-70 (citation omitted).

As noted above, the Commissioner determined that Plaintiff has a medically determinable impairment which could reasonably be expected to produce the pain, to wit: a vertebrogenic disorder of the lumbosacral spine and a post-laminectomy syndrome. (Tr. 25, ¶3). The question becomes, then, whether the evidence supports Plaintiff's allegations of disabling pain.

The record reflects that over time, Plaintiff's various treating physicians have

documented few severe objective clinical findings. For example, Dr. Cole noted that Plaintiff had tenderness to palpation a reduced range of motion, and a narrow-based gait. However, Dr. Cole also essentially reported that Plaintiff's neurological examination was normal. In addition, Dr. Goodson reported, at most, some right leg atrophy and Dr. Boehmer's office records reflect few objective clinical findings.

While the test results of record, specifically MRIs, arguably support a finding that Plaintiff experiences pain, the findings reported were, at worst, moderate. Nevertheless, the fact that there are positive test results does not, standing along, require a conclusion that an individual experiences pain of a disabling level.

In contrast to the reports of Plaintiff's treating physicians, while Dr. Vitols noted that Plaintiff had tenderness to palpation and a restricted range of lumbar spine motion, he also noted that Plaintiff's reflexes were normal, his calf and thigh measurements were equal, and he had no decreased sensation. Further, although Dr. Vitols noted the presence of some positive clinical findings, he also determined that Plaintiff's work capabilities were compatible with a limited range of sedentary work. Additionally, while the MA noted that Plaintiff had some positive clinical findings, he concluded that Plaintiff was able to perform a limited range of work. Finally, the reviewing physicians of record agreed that Plaintiff's residual functional capacity was consistent with performing range of sedentary work. (Tr. 242-46).

In addition, the record reflects that Plaintiff does not take any prescription analgesics, specifically narcotic or otherwise, for pain, (Tr. 151; 145-47). Indeed, Dr. Boehmer noted that Plaintiff's pain is controlled by Ibuprofen. (Tr. 389). Further, Plaintiff does not receive any current medical treatment. (Tr. 492).

The record also shows that Plaintiff engages in a variety of activities. For example, Plaintiff drives, shops, visits with others, walks, cares for his personal needs, watches television, (Tr. 487; 504-07). While these activities, standing alone, may not indicate an ability to perform substantial gainful activity, when they considered with the other evidence noted above, they support the Commissioner's conclusion as to Plaintiff's subjective complaints. Finally, although Plaintiff alleges that he requires the use of crutches to walk and must lay down for significant periods of time during the day, there simply is no medical evidence which supports those allegations.

Under these facts, the Commissioner did not err by failing to find that Plaintiff has pain that is at a disabling level.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

July 21, 2008.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

J:\Social Security - Drafts\Cooper_SSD&SSI.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).